TAM:JJC:mel

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES V. HOWARD, | : | No. 3:CV-05-1372 |
| Plaintiff | : | |
| | : | |
| v. | : | (Caputo, J.) |
| | : | |
| BUREAU OF PRISONS, et al., | : | |
| Defendants | : | Filed Electronically |

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS
## AND FOR SUMMARY JUDGMENT

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

s/ Jennifer J. Clark
JENNIFER J. CLARK
Assistant U.S. Attorney
PA 82294
MICHELE E. LINCALIS
Paralegal Specialist
316 Federal Building
240 West Third Street
Williamsport, PA 17701
Phone:  (570)348-2800
Facsimile: (570)348-2816

Date: June 5, 2007

NOW COME Defendants Nash, R. Smith, Bittenbender, Londis, Walters, Litchard, Ray, J. Smith, Morales, Hollenback, Gabrielson, Bunch, Dodrill, Reisinger, Marr, and the Bureau of Prisons, by and through their counsel, Thomas A. Marino, United States Attorney for the Middle District of Pennsylvania, and Jennifer J. Clark, Assistant United States Attorney who file this brief in support of their motion to dismiss and for summary judgment in accordance with Local Rule 7.5.

## I.  PROCEDURAL HISTORY

James V. Howard, an inmate incarcerated at USP Lewisburg and previously confined at FCI Schuylkill, initiated this Bivens[1] action on July 8, 2005 against the Bureau of Prisons ("BOP") and 14 of its employees, including one "Unnamed Correctional Officer." Doc. 1. On March 15, 2007, with leave of court, Howard amended his complaint by identifying the unknown officer and naming an additional defendant.  Doc. 135.

The 15 individual defendants, each sued in his or her individual and official capacities, are as follows:  John Nash, former Warden of FCI Schuylkill; Robert P. Smith, Correctional Counselor, FCI Schuylkill; Dr. Gary Londis, Chief Psychologist, FCI Schuylkill; Dr. Glenn Walters, Psychologist, FCI Schuylkill; Kevin Bittenbender, Discipline Hearing Officer ("DHO"), FCI Schuylkill; Craig Litchard, former Lieutenant at FCI Schuylkill; Thomas Reisinger, Special Investigative Supervisor ("SIS") Technician at FCI Schuylkill; Joseph Smith, former Warden of USP Lewisburg; Jon-Michael Moralez and Kenneth Gabrielson,

---

[1]  Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971).

Lieutenants at USP Lewisburg; Dean Hollenbach, Unit Manager, USP Lewisburg; James Marr, Correctional Officer at USP Lewisburg; Jeff Bunch, DHO, USP Lewisburg; Scott Dodrill, Regional Director; and Mickey Ray, former Regional Director.

In his Amended Complaint, Howard raises the following allegations, recited here by count:

I.    Defendants Londis and Walters were deliberately indifferent to his need for mental health treatment, counseling and minimal accommodations, depriving him of his rights under the Americans with Disabilities Act ("ADA") and/or the Rehabilitation Act of 1973 ("Rehab Act");

II.   Defendants Smith and Nash failed to preclude a policy of coercing Howard into the general inmate population, thereby exhibiting deliberate indifference and violating Howard's Eighth Amendment rights;

III.  Defendant Ray denied Howard participation in a court recommended drug treatment program due to his disability, in violation of the ADA;

IV.   Defendant Gabrielson used excessive force, confiscated Howard's legal and religious material, and imposed sanctions upon him prior to disciplinary hearings, thereby violating Howard's First, Fifth, Eighth, and Fourteenth Amendment rights;

V.    DHOs Bittenbender and Bunch violated Howard's liberty interest by the imposition of sanctions.  Additionally, Defendants R. Smith and Hollenbach failed to consider Howard's safety requirements;

VI.   Defendant Morales violated Howard's Eighth Amendment rights by placing him in dry cell, and Defendant Reisinger violated the Fifth and Eighth Amendments by falsifying an incident report against Howard; and,

VII.  Defendant Marr violated Howard's Eighth Amendment rights by assaulting him in the Special Housing Unit ("SHU") .

See Doc. 135.  As relief, Howard demands a jury trial, an award of both monetary and declaratory relief,  and the issuance of an order prohibiting Defendants from harassing,

2

punishing or retaliating against him and from transferring him to any other institution without his consent during the pendency of this lawsuit.  Finally, Howard seeks to have all references to this lawsuit removed from his files.  Doc. 135, pp. 10-11.    Defendants submit the following brief in support of their Motion to Dismiss and for Summary Judgment filed May 21, 2007. Doc. 144.

## II.  STATEMENT OF FACTS

### A.    Exhaustion of Administrative Remedies

The BOP has established an administrative remedy procedure through which an inmate can seek formal review of any complaint regarding any aspect of his imprisonment.  See 28 C.F.R. § 542.10, et seq.  Howard has submitted 122 administrative remedies.  See Ex. 1 ¶ 9. With regard to Count I of his Amended Complaint, Howard did not complete the administrative remedy process by appealing the denials of his requests through to the Central Office of the BOP.  Id. ¶10.  Howard has filed no administrative remedies with regard to Count II of his Amended Complaint . Ex. 1 ¶ 11.  Regarding Count V of his Amended Complaint pertaining to DHO hearings, Howard has exhausted administrative remedies for only two of the thirteen incident reports he received for refusing a work or program assignment (code 306).  Id. ¶ 14. Of the remaining eleven incident reports, Howard did not file any administrative remedies with regard to eight of them, and for three incident reports, Howard did not appeal lower level rejections to the Central Office.  Id.   Regarding Count VI (placement in a dry cell and deprivation of bedding and soap) and Count VII, all of Howard's requests were rejected.

3

**B.    Howard's Mental Health Treatment at FCI Schuykill**

Howard arrived at FCI Schuylkill on July 22, 2002.  Ex. 2 (Londis Decl.) ¶ 6.
Defendants Londis and Walters reviewed available records in Howard's Psychology Data File,
which revealed that both defendants saw Howard on numerous occasions while he was
incarcerated at FCI Schuylkill.  Ex. 2 ¶ 7;  Ex. 3 (Walters Decl.) ¶ 7.

On July 25, 2002, Howard stated to Dr. Walters during an interview in the SHU that he
was not feeling pressure from any of the other inmates, but wanted to be housed in the SHU,
which is a lock down unit where inmates spend 23 hours per day in their cells.  After this
meeting, Dr. Walters determined that Howard had a "schizoid" personality, *i.e.*, that Howard
did not like being around other people, but that Howard did not need specific mental health
treatment.  Howard was cleared to return to general population.  Ex. 3 ¶ 9.

On July 30, 2002, Dr. Londis met with Howard in the SHU at the request of institution
staff.  Howard reported to Dr. Londis that he suffers from paranoid schizophrenia, a bi-polar
disorder and hears voices, but that he stopped taking psychotropic medications seven years ago.
Dr. Londis also determined that Howard has a "schizoid" personality (as opposed to paranoid
schizophrenia), and referred Howard to a psychiatrist, noting that he has a history of
hospitalization for mental health issues.  Ex. 2 ¶ 8.

Howard was seen by Drs. Londis and/or Walters at least monthly while housed in the
SHU, and on many other occasions at his or staff's request.  See Exhibit 2, ¶¶ 8-15; Exhibit 3,
¶¶ 8-30.   Howard remained in SHU until his transfer to USP Lewisburg on April 5, 2004
(because he refused to join general population and take a cell mate).  He also refused to see the

4

psychiatrist and he refused beneficial psychotropic medication treatment. Ex. 2 ¶¶ 14, 16. During those periods of time when Howard was housed in general population, he did not request any psychological services.  Ex. 3 ¶ 30.  However, he did request single cell status, placement in the SHU, and to be excused from working so he could sit in a cell all day.   Ex. 2 ¶¶ 10-13.

Contrary to his claims, Howard is not suffering from a bi-polar disorder, schizophrenia or "related disorders".  He suffers from schizoid personality disorder.  Ex. 2 ¶ 17; Ex. 3 ¶ 32. In the opinions of Drs. Londis and Walters, Howard did not have any mental health issues which would have precluded him from being housed in general inmate population with a cell mate.  Additionally, a single cell assignment was not medically necessary for Howard.  Ex. 2 ¶ 18;  Ex. 3 ¶ 33.

## C.    Use of Force

On December 27, 2004, Lt. Gabrielson was performing his duties as the SHU Lieutenant.  Ex. 4 (Gabrielson Decl.) ¶ 5.  On that date, Howard was being housed in cell 311 on the third floor of SHU.  Ex. 4 ¶ 6.

At approximately 4:20 p.m., after Lt. Gabrielson's shift had ended and he departed the institution, Howard refused to return the lids to his food trays to staff unless he was removed from his cell.  Howard  was given two direct orders which he refused. Ex. 4 ¶ 7.

At approximately 9:30 p.m., the Operation's Lieutenant approached Howard and was able to convince Howard to return the food lids in exchange for being moved to another cell. Howard was then placed in hand cuffs and moved to cell 004 in SHU without incident.  Ex.

4 ¶ 9.  As a result of his actions, Howard received an incident report for "Refusing to Obey an Order of Any Staff Member", a code 307 violation of the BOP's disciplinary code.  Ex. 4 ¶ 10 and p. 12.

Lt. Gabrielson, after being called to the institution specifically to deal with Howard's actions, was informed that he was authorized to assemble a Use of Force Team and to utilize hard ambulatory restraints if the situation required it, in accordance with BOP Program Statement 5566.05, <u>Use of Force and Application of Restraints on Inmates</u>.  Ex. 4 ¶ 11.

At approximately 10:35 p.m., Lt. Gabrielson approached cell 004 and gave Howard a direct order to comply with hand restraints so that Howard could be escorted to another cell with a cell mate.  Ex. 4 ¶ 12.  Howard complied with Lt. Gabrielson's order to submit to restraints, but stated that he would not take a cell mate and that he was not going to be celled with anyone.  This is contrary to BOP policy which requires inmates to take cell mates at the direction of staff.  Ex. 4 ¶ 13.

Lt. Gabrielson then ordered Howard to go to cell 005 and accept a new cell mate.  Howard refused, stating that he would not live with anyone in the unit.  Although Lt. Gabrielson used confrontation avoidance procedures as required by BOP P.S.  5566.05,  page 7, ¶ 7, his efforts were unsuccessful.  Ex. 4 ¶ 14 and pp. 22-23.

Lt. Gabrielson escorted Howard to cell 024 <u>without</u> incident and he directed the Use of Force Team to search Howard for contraband.  At the conclusion of the search, in order to

enforce the institutions' regulations, Howard was placed in hard ambulatory restraints since he refused to obey staff orders and refused to take a cell mate.  Ex. 4 ¶ 1.

The use of progressive and ambulatory restraints is authorized by P.S. 5566.05, page 9, ¶ 9.  Specifically, based on an inmate's behavior, more restrictive and secure restraints may be used.   The use of hard ambulatory restraints is part of a progressive use of restraints. Ambulatory restraints are defined as approved soft and hard restraint equipment which allow the inmate to eat, drink, and take care of basic human needs without staff intervention.  Ex. 4 ¶¶  16-18 and p. 24.

At approximately 10:45 p.m., Howard was examined by a Physicians Assistant ("PA"), who noted that Howard was compliant and no calculated force was needed.  He further noted that Howard refused to sign the form, and that Howard was alert and ambulatory and did not appear to be in any distress.  He did not have any injuries and had normal distal circulation in all of his extremities with the ambulatory restraints.  It was noted that no medical follow-up was required and that restraints would be checked in accordance with policy requirements.  Ex. 4 ¶¶  19-22 and p. 41.  Howard was then placed in cell #004 <u>without</u> incident.  Ex. 4 ¶ 24.

On December 28, 2004, Lt. Gabrielson delivered a copy of the incident report to Howard for the code 307 violation, who informed Lt. Gabrielson that "I am not taking a cell mate and if this is what I have to do so be it".  Ex. 4 ¶ 25 and p. 13

However, on December 29, 2004, Howard informed Lt. Gabrielson that he was ready to continue programming and that he would take a cell mate.  Since Howard's behavior

indicated that he was ready to comply with staff orders and conduct himself in accordance with BOP rules and regulations, the hard ambulatory restraints were removed.  Howard was then placed in cell 005 <u>without</u> incident.  Howard had been in hard ambulatory restraints for approximately thirty-nine hours.  Ex. 4 ¶ 26.

Contrary to Howard's assertions, he was not "deprived of sheets and blanket".  Howard was allowed to wear a t-shirt and boxer shorts and was given a mattress and a blanket.  While in hard ambulatory restraints, Howard was not allowed to have sheets.  Ex. 4 ¶ 27.

Although Lt. Gabrielson was not present during the entire period that Howard was in hard ambulatory restraints, Howard was checked by custody staff members approximately every fifteen minutes; he was seen by a Lieutenant at least once each eight hour shift; and he was checked by a PA upon his initial placement in the restraints and at least once per eight hour shift thereafter.  Ex. 4 ¶ 28 and pp. 46-55.  Throughout the time period that Howard remained in hard ambulatory restraints, he remained aggressive and non-compliant.  Ex. 4 ¶ 29 and pp. 46-55.  Based on Howard's actions, Lt. Gabrielson wrote an incident report charging Howard with a code 306 violation of the disciplinary rules (Refusing a Program Assignment) and a code 307 violation of the disciplinary rules (Refusing an Order).  Ex. 4 ¶ 30 and p. 41.

Contrary to Howard's claim, Lt. Gabrielson did not confiscate his personal or religious property.  As the SHU Lieutenant, Lt. Gabrielson is generally not involved in any actions concerning inmate personal property.  Those issues are handled by the line staff within the unit and by the SHU property officer.  Ex. 4 ¶ 33.

8

**D.**    <u>**Howard's Housing Assignments**</u>

As a correctional counselor, Defendant R. Smith was responsible for making cell assignments for inmates in his housing unit.  Ex. 5 (R. Smith Decl.) ¶ 5.  Upon Howard's arrival at FCI Schuylkill at on July 22, 2002, Howard was placed in the institution's SHU pending classification and assignment to a specific housing unit.  Ex. 5 ¶ 6.  Since arriving at that institution, Howard has sought to have a cell with no cell mate, and to be alone as much of the day as he could.  <u>See</u> Ex. 5, paras. 7- 28.

On September 4, 2002, Howard approached Counselor  Smith and requested a single cell assignment based on unspecified "mental health issues".  Counselor  Smith informed Howard that due to an increase in the inmate population, single cell status was not available at that time.  Further, Counselor Smith informed Howard that he could check with the institution's psychologist (Dr. Londis) to discuss any mental health issues.  Ex. 5 ¶ 11. Continuing his resistence to being double-celled, Howard received several incident reports for refusing to accept a cell mate and refusing to report to work assignments, citing "mental health issues."  <u>See</u> Ex. 5, paras 7-28.

On April 28, 2003, inmate Dorsey was assigned to Howard's cell (cell 228, upper bunk). Ex. 5 ¶ 22.  Howard and Dorsey were cell mates for several months without incident.  At no time did either inmate inform Counselor Smith that they could not be cell mates, that either one of them was in danger, or that there were any issues between them.  Ex. 5 ¶ 23.  However, on July 24, 2003, Howard received an incident report for fighting with Dorsey and he was placed in SHU.  Ex. 5 ¶ 25.

9

On August 21, 2003, Howard was released from SHU and assigned to Unit IV B in a common area.  Howard refused to stay in the common area of the unit and was immediately returned to SHU.  Ex. 5 ¶ 26.  On September 12, 2003, Howard received another incident report for refusing a work/program assignment.  Ex. 5 ¶ 27.  Howard remained in SHU until his transfer from FCI Schuylkill to USP Lewisburg, on April 5, 2004.  Ex. 5 ¶ 28.

Although Counselor Smith does not recall making any specific cell assignments for Howard while he was incarcerated at FCI Schuylkill, it was (and still is) his practice to base cell assignment decisions on numerous factors, including the safety of staff and inmates, security of the institution, medical restrictions, and inmate separatee issues.  Counselor Smith would also check with both inmates before making cell assignments to determine if there were any negative factors which could impact such assignments.  Ex. 5 ¶ 29.

Howard did not have any separatees, mental health issues, restrictions, or assignments which would have precluded Counselor Smith from assigning Howard to a particular cell or with a particular inmate.

The BOP requires all inmates to take a cell mate, absent extraordinary circumstances such as suicide watch, extreme danger to himself or others, or while they are in transit.  Single cell assignments are the exception, not the rule.  Ex. 5 ¶ 32.

Howard arrived at USP Lewisburg from FCI Schuylkill on April 5, 2004 as a greater security transfer for receiving numerous incident reports while at FCI Schuylkill.  Upon his

10

arrival, Howard was placed in the institution's SHU pending classification.  Ex. 6 (Hollenbach Decl.) ¶ 5.

During processing, Howard appeared before the institution's Quay Committee.  The Quay Committee reviews each incoming inmate's records and ensures that the inmate's medical needs are met, that the appropriate housing assignment is made, and that the inmate is appropriately designated to this institution.  As part of this process, the inmate is interviewed and additional information is obtained if necessary.  Defendant Hollenbach was part of the Quay Committee that interviewed Howard and reviewed his records.  Ex. 6 ¶ 6.

On May 12, 2004, Howard requested to speak with the Operations Lieutenant.  Howard was escorted to the Lieutenant's Office and he stated that he wanted to "check-in" to the SHU. Howard was then placed in SHU pending an investigation by his Unit Team.  Ex. 6 ¶ 9.

On Wednesday, May 19, 2004, Defendant Hollenbach interviewed Howard in SHU. Howard informed Defendant Hollenbach that "that thing from Schuylkill has followed me here."  Defendant Hollenbach asked Howard what he meant and he stated that he was involved in a fight with his cell mate at Schuylkill and that two inmates from the USP Lewisburg compound had approached him concerning the fight and informed him to "check-in" to SHU. Ex. 6 ¶ 10.

Howard did not identify either inmate.  Defendant Hollenbach informed Howard that if he did not know the identity of the two inmates, Defendant Hollenbach would not be able to verify his claims.  Howard stated that he understood and that he was not "going back out"

11

onto the general inmate compound.  Ex. 6 ¶ 11. Defendant Hollenbach also interviewed Howard's cell mate who informed him that he did not know anything.  Ex. 6 ¶ 12.

Defendant Hollenbach was not able to obtain any information to verify Howard's claims, nor would Howard provide any such information to him.  Additionally, Defendant Hollenbach was not approached by any other inmates within the unit with any information that Howard could not be housed in the unit.  Based on Defendant Hollenbach's experience, if an inmate has a problem in a unit, other inmates will approach staff and inform them to keep the inmate out of the unit.  Ex. 6 ¶ 13.

On June 9, 2005, Defendant Hollenbach determined that Howard's claims could not be verified.  Defendant Hollenbach therefore recommended that Howard be considered an "unverified" protection case and be released from SHU to the general inmate compound.  Ex. 6 ¶ 14.  Howard continued to refuse to leave SHU and as a result, he received numerous incident reports for refusing a work/program assignment.  Ex. 6 ¶ 15.

Since the time Howard requested to be placed in SHU, he has been unable to provide any information which would change his status from an "unverified" to a "verified" protection case.  Ex. 6 ¶ 16.

On August 15, 2005, Howard agreed to leave SHU and he was placed in the institution's general inmate population on E Block.  Ex. 6 ¶ 20.  Since that date, Howard has not raised any security concerns with Defendant Hollenbach, nor has he made any requests to be placed in

SHU.  In fact, it appears as though Howard is functioning normally and he has remained incident report free since June 8, 2005.  Ex. 6 ¶ 21.

    **E.**    **The "Falsified" Incident Report**

On July 25, 2003, Defendant Reisinger prepared an incident report charging Howard with violating code 201, Fighting with Another Person.  Ex. 7 ¶ 2 and p. 5.  The incident report was based upon interviews, documentation, and assessments, which concluded that on July 24, 2003, at approximately 10:40 a.m., Howard was involved in a physical altercation with his cell mate, inmate Kevin Dorsey.  Ex. 7 ¶ 5.

More specifically, during separate interviews with Howard and Dorsey, both stated that they were involved in a verbal argument and that it escalated into a physical altercation. Howard also admitted attempting to strike inmate Dorsey in the body with a closed fist.  Dorsey also admitted to pushing Howard down, causing Howard to hit his head on the toilet.  Ex. 7 ¶ 5. Id.  Both inmates were evaluated by Health Services staff and both had injuries consistent with being in a physical altercation.  Ex. 7  ¶ 3 and p. 8.

Subsequently, a DHO hearing was conducted on the incident report and Howard was found to have committed the prohibited act.  The DHO relied upon the Defendant Reisinger's statement in Section 11 of the incident report, as well as photographs of both inmates after the incident and the Inmate Injury Assessment and Follow-Up forms.  Ex. 7 ¶ 9 and p. 10.  The DHO noted that he believed Defendant Reisinger's statement since he did not receive any known benefit from providing false information.  Ex. 7 ¶ 9 and p. 10.  Howard was sanctioned

13

to 30 days in disciplinary segregation; 180 days loss of telephone privileges; and 90 days loss of commissary privileges.  Ex. 7 p. 11.

### F.    Alleged Assault by Staff in SHU

On June 8, 2005, Senior Officer Specialist Marr was assigned to work in the USP Lewisburg SHU on the first floor when a call for assistance on the third floor was announced.  Ex. 8 (Marr Decl.), ¶ 3.   Officer Marr responded and observed Howard and his cell mate standing in the cell with marks and blood on them.  It appeared to Officer Marr and to the other staff members who responded that the inmates had been engaged in a confrontation in their locked cell.  Ex. 8 ¶¶ 4-5 and pp. 5-12.  Both inmates complied with staff orders to submit to hand restraints.  Ex. 8 ¶ 6 and pp. 7-12.  With the assistance of another staff member, Officer Marr escorted Howard out of the cell and he was examined by medical staff without incident. Ex. 8 ¶ 4 and p. 7.  Officer Marr had no further involvement in the incident.  Ex. 8 ¶ 7.

Howard told Health Services staff that his cellmate slammed his head into the bars.  He was treated for multiple scratches, abrasions on the right lateral neck, two abrasions over the right scapula, a hematoma superior on his left eye, a twenty millimeter laceration on his right parietal, and a hematoma on this right parietal area.  Ex. 8 ¶ 9 and p. 14.

Subsequently, Howard was issued an incident report for Fighting with Another Person. Ex. 8  ¶ 10 and p. 16.  Following a DHO hearing, Howard was found to have committed the prohibited act.  Specifically, the DHO found that the eyewitness accounts of the incident all observed the inmates with injuries consistent with them being in a fight, as well as the Inmate Injury Assessment and Followup forms and photographs of the inmates after the incident.

14

Additionally, the DHO also considered a handwritten letter from Howard to his cellmate, where Howard is attempting to get his story straight with his cellmate prior to the DHO hearing.  Ex. 8 ¶ 13 and pp. 18-22.

## III.  QUESTION PRESENTED

Should the Motion to Dismiss and for Summary Judgment be granted?

Suggested answer in the affirmative.

## IV.  ARGUMENT

**Legal Standard**

Summary judgment is appropriate when supporting materials, such as affidavits and other documentation, show that there are no material issues of fact to be resolved and the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56.  According to the Supreme Court, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  The Supreme Court further stated that "Rule 56(e) . . . requires that the non-moving party go beyond the pleadings by [his] own affidavits, or by 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Celotex</u>, 477 U.S. at 324.

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the Supreme Court mandated that an opposing party must adduce more than a mere scintilla of evidence in its favor, and

cannot simply reassert factually unsupported allegations contained in its pleadings.  See Liberty Lobby, Inc., 477 U.S. at 248-249.  Further, an opposing party cannot defeat summary judgment simply by asserting that a jury might disbelieve an opponent's affidavit.  See id. at 256-257.

## A.    Sovereign Immunity

In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), the Supreme Court implied a cause of action for damages against federal employees, as individuals, for the violation of constitutional rights.  The same immunities that are granted to state officials in § 1983 civil rights actions apply to federal employees.  Butz v. Economou, 438 U.S. 478, 496-505 (1978).

The doctrine of sovereign immunity is "inherent in our constitutional structure" and renders the United States of America, its departments and officials immune from suit except where the United States has consented to be sued.  Williamson v. United States Dep't of Agriculture, 815 F.2d 368, 373 (5thCir. 1987).  See also FDIC v. Meyer, 510 U.S. 471, 486 (1994) (citing Loeffler v. Frank, 486 U.S. 549, 554 (1988)).  Thus, absent an express congressional waiver of sovereign immunity, the United States cannot be sued.  See Osborn v. Bank of United States, 22 U.S. 738 (1824); Kawananakoa v. Polyblank, 205 U.S. 349 (1907); United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Sherwood, 312 U.S. 584, 586 (1941).

Although 28 U.S.C. § 1331 provides a source of jurisdiction for causes of action arising under the constitution, laws or treaties of the United States, it does *not* constitute a waiver of sovereign immunity with regard to actions involving monetary damages.  Accordingly,

16

Howard's claims against the United States of America and its employees, acting in their official capacities, for money damages pursuant to 28 U.S.C. § 1331, are barred by the doctrine of sovereign immunity.  See Meyer, 510 U.S. at 486 (holding that federal agency – even one as to which Congress has waived sovereign immunity – is not subject to liability in damages under Bivens); Chinchello v. Fenton, 805 F.2d 126, 130 n.4 (3d Cir. 1986).  Accordingly, Howard's constitutional claims against the individual defendants  (as sued in their official capacities for money damages) and the BOP are barred by sovereign immunity and, as such, judgment on those claims must be entered in favor of Defendants and against Plaintiff.

**B**.       **Exhaustion of Available Administrative Remedies**

To exhaust appeals under the Administrative Remedy Procedure for inmates, an inmate must first raise his complaint with the Warden of the institution where he is confined.  The inmate must then further appeal an adverse decision to the Regional Director and then to the Central Office of the BOP.  See 28 C.F.R. § 542 et seq.  No administrative grievance is considered to have been finally exhausted until denied by the BOP's Central Office.  See 28 C.F.R. § 542.15.  If the appeal is denied by the Central Office, the inmate may then file a civil action.  See 28 C.F.R. §§ 542.10 and 542.15.

If the inmate reasonably believes the issue is sensitive and that the inmate's safety or well-being may be jeopardized if the grievance became known at the institution, he may submit the request directly to the appropriate Regional Director.  If the inmate is dissatisfied with that response, he may then appeal that decision to the Central Office.  Id.

In the ordinary course of business, a computerized index of all administrative requests and appeals filed by inmates is maintained in a BOP computerized database so that rapid verification may be made as to whether an inmate has exhausted the administrative remedy process.  See Ex. 1 (Sullivan Decl.) at ¶ 8.

Title 42 U.S.C. § 1997e(a) provides that "no action shall be brought with respect to prison conditions under section 1983 or any other federal law . . . until such administrative remedies as are available are exhausted."  This exhaustion requirement applies to actions brought under the authority of the Bivens decision.  Nyhuis v. Reno, 204 F.3d 65, 68 (3d Cir. 2000).  The requirement is mandatory, regardless of the relief that the administrative process would provide, Booth v. Churner, 532 U.S. 731, 739 (2001), and regardless of the nature of the claims.  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516, 532 (2002) (citation omitted).

A review of Howard's administrative remedy filings reveals that he has submitted 122 administrative remedies.  See Ex. 1 ¶ 9.  Howard has exhausted his administrative remedies with respect to Counts III, IV, a portion of Count V (housing assignments), and a portion of Count VI (falsified incident report 1126369).  Ex. 1.  He has failed to exhaust administrative remedies with respect to Counts I, II, VII, and the remaining portions of Count V and VI. Thus, Defendant should be granted summary judgment on Howards' claims pertaining to the

denial of his mental health treatment (Count I), the wardens' failure to preclude a policy of coercion (Count II), eleven of the thirteen DHO sanctions issued (a portion of Count V), his placement in the dry cell and being deprived of bedding and soap (a portion of Count VI), and the assault by a staff member.

## C.    Statute of Limitations

Federal civil rights actions do not have a specific statute of limitations imposed by Congress. Johnson v. Railway Exp. Agency, Inc., 421 U.S. 454, 462 (1975)(no federal statute of limitations for civil rights actions); Wilson v. Garcia, 471 U.S. 261, 267 (1985)(no Federal statute of limitations in a Bivens action); and Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers, 855 F.2d 1080, 1088 (3d Cir. 1988)(no Federal statute of limitations in a civil rights action). When such gaps in federal law occur, it is necessary to look to state law to fill the gaps. To that end, federal courts sitting in Pennsylvania have adopted the Commonwealth's two-year personal injury statute of limitations found at 42 Pa. C.S.A. § 5524 in civil rights actions. Lake v. Arnold, 232 F.3d 360, 368 (3d Cir. 2000); Rose v Bartle, 871 F.2d 331, 347 (3d Cir. 1989); Little v. Lycoming County, 912 F. Supp. 809, 814 (M.D. Pa. 1996).

Since Howard filed his original complaint on July 5, 2005 (using the prisoner mailbox rule), any claims which accrued prior to July 6, 2003, (two years before the date of filing this action) should be dismissed with prejudice. Regarding Count I, any claims prior to July 6, 2003, are untimely, including Howard's claims that Defendants Walters and Londis improperly

diagnosed Howard upon his arrival to Schuylkill in July 2002.  Regarding Count II, any claims prior to July 6, 2003 alleging a policy of coercion by Defendant Nash are also untimely.

Regarding Count V, Howard received a total of thirteen incident reports for code 306 violations (refusing work/program assignment).  Applying the two-year statute of limitations, four of these incident reports are untimely claims here – 1031432, 1051512, 1062903, and 1074215.  This observation may be moot, however, since neither Defendant Bittenbender nor Defendant Bunch were connected in any way with any of those four incident reports.  See Ex. 1 ¶ 20.  Similarly, regarding Count V, any allegations concerning cell assignments prior to July 9, 2003 are outside the applicable statute of limitations period.  Consequently, Defendants are entitled to judgment as a matter of law on all claims in Howard's complaint which are untimely.

**D.     Lack of Personal Involvement**

A review of Howard's six counts reveals that he has not made **any** specific claims against Defendants Litchard, Dodrill, or the BOP, even though those individuals/entities are included in Howard's Statement of the Case.  Therefore, these defendants are entitled to judgment in their favor on Howard's claims.

A Bivens complaint must allege that each Defendant was personally involved in the events or occurrences upon which a Plaintiff's claims are based.  As the Court stated in Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988):

> A defendant in a civil rights case must have personal involvement in the alleged wrongs. . . . [P]ersonal involvement can be shown through allegations of

> personal direction or of actual knowledge and acquiescence.  Allegations of
> participation or actual knowledge and acquiescence, however, must be made
> with appropriate particularity. [Citations omitted.]

Therefore, a civil rights complaint must allege the time, place, and persons responsible for

inflicting a constitutional injury upon a Plaintiff.  Id.  A review of the Amended Complaint in

this action reveals that Howard has not included any specific allegations of personal

involvement against Defendants Litchard, Dodrill, or the BOP.  Since the Amended Complaint

fails to allege how each of these Defendants was personally involved in any deprivation of

Howard's constitutional rights, they are entitled to the entry of judgment in their favor as a

matter of law.

**E.**     **Respondeat Superior.**

The Courts have also held that seeking to impose liability on a defendant based solely

on his supervisory status will not subject the official to liability.  See Rode, 845 F.2d at 1208.

Because Howard does not raise constitutional claims against Defendants J. Smith, Nash, or Ray

other than on the basis of their supervisory roles, they are entitled to the entry of judgment in

their favor and against Howard as a matter of law.

In Counts II and III, Howard claims that three Defendants (Joseph Smith, Nash and

Ray), apparently by virtue of their supervisory positions with the BOP, are somehow

responsible for the alleged acts of their subordinates which he claims violated his constitutional

rights.   A prison supervising official, however, cannot be held liable for the actions of others

simply by virtue of his supervisory position since the doctrine of respondeat superior is not an

acceptable basis for liability in a Bivens action.  See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d

Cir. 1993).  Liability may only be based on defendant's personal involvement in conduct amounting to a constitutional violation.  <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077 (3d Cir. 1976).

To the extent that Howard is alleging that he submitted grievances and administrative remedies to these officials, he has not alleged a constitutional violation.  The law is well-settled that there is no constitutional right to a grievance procedure.  <u>See</u> <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 137-38 (1977).  Even if the prison provides for a grievance procedure, violations of those procedures do not amount to a civil rights cause of action.  <u>See</u> <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988); <u>Hoover v. Watson</u>, 886 F. Supp. 410 (D. Del. 1995).  Moreover, alleging supervisory liability in cases where a defendant, after being informed of the violation via the grievance procedure, the filing of reports or appeals, failed to take action to remedy the alleged wrong is *not* enough to show that the defendant has the necessary personal involvement to warrant the imposition of liability.  <u>See</u> <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976)(emphasis added).

Here, Howard alleges that Defendants Nash and Joseph Smith failed to preclude a policy of coercion to force him into the general population.  This coercion was presumably the issuance of disciplinary reports for his repeated refusals to enter general population.  Issuing incident reports for Howard's admitted continued failures to obey an order falls far short of amounting to a constitutional violation.  Additionally, although Howard alleges that Defendant Ray excluded him from a "court recommended drug treatment program," it is Howard who

refused to enter general population and therefore denied himself of the opportunity to participate in the program. The actions of Defendants Nash, Smith and Ray in following BOP regulations, practice and policy certainly do not amount to constitutional violations.  As such, they are entitled to the entry of summary judgment in their favor and against Howard on the claims raised in the Amended Complaint.  See Martinez v. California, 444 U.S. 277, 285 (1980).

**F.     Failure to State an Eighth Amendment Claim for the Use of Excessive Force**

Defendants Gabrielson and Marr are entitled to judgment as a matter of law since there are no material facts in dispute regarding those claims.  In a Bivens action, a complaint must allege specific actions committed by each defendant which violated his constitutional rights in order to state a claim against that defendant.  See Colburn v. Upper Darby Tp, 838 F.2d 663, 666 (3d Cir. 1988); Flanagan v. Shively, 783 F. Supp. 922 (M.D. Pa. 1992), aff'd 980 F.2d 722 (3d Cir. 1992).  In Hudson v. McMillian, 503 U.S. 1 (1992), the Supreme Court held that "whenever prison officials stand accused of using excessive physical force . . . the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Id. at 6-7.  In reaching this conclusion, the Court specifically rejected a "deliberate indifference" standard for judging claims of excessive use of force, finding that standard inappropriate when corrections officials must make decisions "in haste, under pressure, and frequently without the luxury of a second chance."  Id. at 6 (quoting Whitley v. Albers, 475 U.S. 312 (1986)).  Indeed, "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional

23

recognition *de minimus* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (quoting Whitley, 475 U.S. at 327).

In addition, courts considering claims of excessive force have generally held that a single, isolated incident does not rise to the level of a constitutional violation.  See e.g. Norman v. Taylor, 25 F.3d 1259, 1262-64 (4th Cir. 1994); White v. Holmes, 21 F.3d 277, 280-81 (8th Cir. 1994); Black Spotted Horse v. Else, 767 F.2d 516 (8th Cir. 1985); Ricketts v. Derello, 574 F. Supp. 645 (E.D. Pa. 1983).

Here, the only allegation in Howard's complaint that can be construed as amounting to the use of excessive force by Lt. Gabrielson is the allegation that on December 27, 2004, because Howard refused to follow the staff's orders to accept a cell mate, he ordered that Howard be placed in hard ambulatory restraints.  Such actions are sanctioned by BOP Program Statement 5566.05, Use of Force and Application of Restraints on Inmates, and fall far short of amounting to excessive force under the circumstances of this case.  See Exhibit 4, p.24.

Institution records reveal that during the entire period that Howard was in hard ambulatory restraints, he was checked by custody staff members approximately every fifteen minutes; he was seen by a Lieutenant at least once each eight hour shift; and he was checked by a PA upon his initial placement in the restraints and at least once per eight hour shift thereafter.  Throughout the time period that Howard remained in hard ambulatory restraints,

24

the record reveals that Howard remained aggressive and non-compliant.  See Exhibit 4, para. 28.

Clearly, Howard's refusal to take a cell mate resulted in his being placed in hard ambulatory restraints, which were removed as soon as he agreed to follow BOP rules and regulations.  Further, he was monitored every fifteen minutes while wearing the restraints, and was uninjured by the restraints.  Lt. Gabrielson's actions were well within the boundaries set by the Supreme Court in Hudson v. McMillian, 503 U.S. 1 (1992), when he ordered that Howard be placed in ambulatory restraints to maintain the institution's order and discipline and not to sadistically inflict harm: "whenever prison officials stand accused of using excessive physical force . . . the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  Id. at 6-7.

Likewise, with respect to Officer Marr, it cannot be said that the actions taken by him on June 8, 2005 when he responded to a call for assistance rise to the level of a constitutional violation.  The competent summary judgment evidence clearly shows that no use of force took place.  Specifically, numerous memorandums from the date in question clearly show that Officer Marr simply entered Howard's cell, where Howard voluntarily submitted to hand restraints and was escorted to Health Services without incident.  The subsequent DHO Report and evidence used by the DHO–including a handwritten note Howard wrote to his former cell mate--suggest that the injuries suffered by Howard came at the hands of his cellmate, and not

Officer Marr.  Howard only makes unsupported allegations that Officer Marr assaulted him. He fails to provide any evidence to back up his claims.

Howard thus fails to state an excessive use of force claim against Lt. Gabrielson and Office Marr under the facts of this case, and they are entitled to the entry of judgment as a matter of law.

**G.    Favorable Termination Rule**

Concerning the first portion of Count V, Howard received thirteen separate incident reports for code 306 violations ("Refusing Work/Program Assignment").  Eleven of those incident reports involved sanctions which included the forfeiture of statutory good time.  <u>See</u> Ex. 1 ¶ 19.   The incident report issued in relation to Count VII for a code 201 violation ("fighting" with inmate Penaloza-Gomez) also resulted in the loss of statutory good time.  <u>See</u> Ex. 8 at 20.

The Supreme Court's decision in <u>Edwards v. Balisok</u>, 520 U.S. 641 (1997) affected whether courts rely on the standards outlined in <u>Sandin v. Conner</u>, 515 U.S. 472 (1995), regarding protected liberty interests.  Notably, whether the defendant's alleged actions resulted in or imposed "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  <u>Id.</u> at 484.   In this case, Howard does not make any specific allegations regarding the incident reports related to Count V, other than to state that Defendants Bittenbender and Bunch violated his "liberty interest" by their imposition of sanctions against him, purportedly in violation of his Fifth Amendment rights.  <u>See</u> Doc. 135 ¶ 36.

The Supreme Court in <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), and later in <u>Balisok</u>, held that, particularly in the context of loss of good conduct time, prisoners cannot bring a § 1983-styled action for monetary damages against prison officials relating to procedural errors in a disciplinary proceeding when a judgment in favor of the inmate would necessarily imply the invalidity of the disciplinary hearing, unless the inmate can demonstrate that the disciplinary finding has previously been invalidated.  <u>Heck</u>, 512 U.S. at 486-87; <u>Balisok</u>, 520 U.S. at 646-48; <u>see also</u> <u>Torres v. Fauver</u>, 292 F.3d 141, 143, 145-50 (3d Cir. 2002) (stating that the favorable-termination rule applies where the fact or duration of an inmate's confinement is at issue).  This rule also applies in civil rights actions brought pursuant to <u>Bivens</u>. <u>Clemente v. Allen</u>, 120 F.3d 703, 705 (7th Cir. 1997).  Several Courts have interpreted this decision as providing a determination that must be made before it is necessary to address whether a sanction is an atypical and significant burden on an inmate.

As to Count VII, if a court were to find that Howard's allegations that he did not get in a fight with his cellmate, inmate Penalosa-Gomez, and that Defendant Marr was responsible for assaulting Howard, it would necessarily imply that this disciplinary sanction was invalid. Therefore, Howard must satisfy the favorable-termination rule before he has a cognizable civil rights claim.

It is undisputed that Howard has not had his statutory good time restored through the prosecution of a 28 U.S.C. § 2241 petition.  Therefore, Defendants Bittenbender, Bunch, and

Marr are entitled to judgment as a matter of law on the claims in Count V and VII of Howard's Amended Complaint.

**H.   <u>Failure to State an Eighth Amendment Claim for Failure to Protect</u>**

In Count V of the Amended Complaint, Howard contends Defendants R. Smith and Hollenbach violated his Eighth Amendment rights by failing to consider his "safety requirements". Doc. 135 ¶ 37. More specifically, Howard alleges in the Amended Complaint that on July 24, 2003, his cell mate assaulted him in his cell, which cell assignment was made by Defendant Smith (Doc. 135. at ¶¶ 17-18), and that he requested protective custody which was denied him by Defendant Hollenbach (<u>see id.</u> at ¶ 24). Both allegations fail to state claims under the Eight Amendment, but for differing reasons: Howard did not allege, nor can he demonstrate, that Officer Smith knowingly assigned him to a cell with an inmate whom Smith knew would assault Howard, and Howard himself refused to cooperate with the procedural requirements surrounding his request for protective custody, resulting in a characterization of his status as an "unverified protection case."

The Supreme Court stated, regarding Eighth Amendment conditions of confinement claims, that the Constitution "does not mandate comfortable prisons." <u>Wilson v. Seiter</u>, 501 U.S. 294, 298 (1991). Conditions of confinement in prison may be restrictive and harsh, but inmates may not be deprived of their "basic human needs–e.g., food, clothing, shelter, medical care, and reasonable safety." <u>Helling v. McKinney</u>, 509 U.S. 25 (1993). Nor may prison officials expose prisoners to conditions that "pose an unreasonable risk of serious damage to [their] future health." <u>Id.</u> at 35. It is only those conditions of confinement that result in the

28

denial of the minimal civilized measure of life's necessities that are sufficiently serious to violate the Constitution.  See Farmer v. Brennan, 511 U.S. 825, 234 (1994); Rhodes v. Chapman, 452 U.S. 337, 347 (1981).

In raising an Eighth Amendment conditions of confinement claim, an inmate must meet two requirements: he must show that his conditions of confinement posed a substantial risk of serious harm (objective element) and that the prison official he seeks to hold liable was deliberately indifferent to his health or safety (subjective element).  See Farmer, 511 U.S. at 834; Wilson, supra.  See also Arnold v. South Carolina, 843 F. Supp. 110, 114 (D.S.C. 1994)(Eighth Amendment is not to be trivialized and must be reserved for most serious or egregious violations of inmate's rights).  Thus, a prison official cannot be found liable under the Constitution for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.  The official must both be aware of facts from which it could be inferred that a substantial risk of serious harm exists, and he must also draw the inference.  See Farmer, 511 U.S. at 837.  Moreover, in assessing "wantonness" of conduct, the court must look to "the constraints facing the official."  Wilson, 501 U.S. at 303.

Here, Howard cannot satisfy the two-pronged analysis for establishing a failure to protect claim under the Eighth Amendment.  First, Howard cannot demonstrate that celling him with another inmate objectively placed him at serious risk for harm.  Contrary to Howard's unsupported allegations, he did not suffer from any mental health issues which would have

29

precluded him from being assigned a cell mate in accordance with BOP policies.  Both Drs. Londis and Walters agreed that Howard's schizoid personality did not present a danger to himself or others, and he was cleared  for placement in general population.  Second, Howard did not allege that Defendant Smith knowingly disregarded his health or safety by placing him with a cell mate, failing to meet the second requirement of a failure to protect claim.  In fact, Howard asserts in his complaint that Officer Smith assigned him a cell mate following the determination by Drs. Londis and Walters that he did not medically require a single cell. Additionally, Howard celled with Inmate Dorsey, with whom he had the July 24, 2003 altercation, without incident for three months.  See Exhibit 5 ¶ ¶ 22-25.  Without any genuine issues of material fact in dispute, Defendant Smith is entitled to summary judgment on Count V of Howard's Amended Complaint.

Neither can Howard satisfy the objective and subjective elements of a failure to protect claim with regard to Defendant Hollenbach.  Howard requested protective custody on the basis that he believed himself to be at risk as an exposed "informant".  (Doc. 135 ¶¶ 23-24).  Upon receiving Howard's request, he was immediately placed in AD for his protection pending an investigation. See Ex. 6 ¶ 9. Defendant Hollenbach conducted an investigation into his claims, all of which were unsubstantiated due to the fact that Howard refused to name the two inmates whose conversation he overheard which purportedly identified him as an "informant".   Id. ¶¶ 11, 3.  Without any supporting information to substantiate Howard's claim that his safety was at risk, he was classified as an "unverified protection" case, and released back into general

population.  Howard's own refusal to cooperate impeded the investigation into whether Howard was, in fact, at risk of any harm.  Howard thus fails to demonstrate that the denial of protective custody status following his communication to BOP staff that he felt he was at risk as an identified informant posed a substantial risk of serious harm (objective element)[2],

Nor can he show that Defendant Hollenbach was deliberately indifferent to his safety since Howard was immediately placed into AD pending investigation into his claims, and because it was Howard's own obstructionist behavior in failing to cooperate with the investigation that led to his release back into general population.  Consequently, Howard fails to establish a claim for failure to protect under the Eighth Amendment.[3]  See Farmer, 511 U.S. at 834; Wilson, supra.  See also Arnold v. South Carolina, 843 F. Supp. 110, 114 (D.S.C. 1994)(Eighth Amendment is not to be trivialized and must be reserved for most serious or egregious violations of inmate's rights).

## I.    Failure to State Fifth Amendment Claim of Due Process

In Count VI of the Amended Complaint, Howard alleges that SIS Technician Reisinger falsified the incident report he issued against Howard for fighting with inmate Dorsey on July 24, 2003, in violation of his Eighth and Fifth Amendment rights.  As indicated in Defendant

---

[2] Howard's testimony regarding two specific assaults, July 24, 2003 and January 5, 2004, were the result of other circumstances, i.e., one involved a geographical inmate dispute (Howard was a D.C. Inmate) and the other had to do with Howard's cellmate's failure to adhere with his medical directive to take medication.  See Doc. 18, Transcript of Preliminary Injunction hearing on July 13, 2005, p. 21-24, 36.

[3] Incidentally, as of August 15, 2005, per Howard's own request, he has entered the general inmate population at USP Lewisburg and he has functioned there without incident.

31

Reisinger's statement in the incident report, the charges was based upon interviews in which both Howard and Dorsey admitted to being involved in a physical altercation, medical evaluations indicating that both had injuries consistent with being in a physical altercation, and photographs of the two following the incident.  See Ex. 7.

In Wolff v. McDonnell, 418 U.S. 539 (1974), the Supreme Court outlined the due process standards applicable in inmate discipline actions. The procedures mandated by Wolff require: (1) that written notice of the charges be given to the inmate at least twenty-four hours in advance of his appearance before the prison disciplinary board; (2) that the prison disciplinary officials make a written statement as to the evidence relied upon and the reasons for taking any disciplinary action; (3) that the decision-maker be impartial; (4) that the inmate be afforded the opportunity to have non-attorney representation when the inmate is illiterate or the disciplinary proceeding involves complex issues; and (5) that the inmate be allowed to call witnesses and present documentary evidence at the hearing where such would not by unduly hazardous to institutional safety or correctional goals.  Id. at 564-71.

In Superintendent v. Hill, 472 U.S. 445 (1985), the Supreme Court provided guidance to a court reviewing the Wolff requirements for a prison discipline hearing, essentially holding that at minimum, a prisoner is entitled to (1) adequate written notice of the charges against him; (2) an opportunity to call witnesses and present documentary evidence in his own defense; and (3) a written statement by the fact finder of the evidence relied upon.

The Supreme Court stressed that the decision of a prison disciplinary officer is entitled to considerable deference by a reviewing court.  The requirements of due process are met, and the decision of the prison discipline officer must be upheld, if there is "some evidence" to support the decision.  472 U.S. at 457.  The <u>Hill</u> Court described the process to be used by the reviewing court as follows:

> Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence.  Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

472 U.S. at 455-456.  <u>See</u> <u>Griffin v. Spratt</u>, 969 F.2d 13, 19 (3d Cir. 1992); <u>Thompson v. Owens</u>, 889 F.2d 500 (3d Cir. 1989).  Once the reviewing court determines there is "some evidence" to support the finding of the DHO, the court must reject the evidentiary challenge by the plaintiff and uphold the finding by the DHO.  <u>Griffin v. Spratt</u>, 969 F.2d 13, 19 (3d Cir. 1992); <u>Thompson v. Owens</u>, 889 F.2d at 501.

In Howard's case, both evidentiary and procedural requirements were met.  More specifically, he received adequate notice of the charges set forth against him, he had the opportunity for a staff representative to assist him, he was provided with the opportunity to make a statement, call witnesses, and present documentary evidence on his own behalf, and the DHO properly documented that "some evidence" existed to support his findings.

There is no evidence that Defendant Reisinger's statement on the incident report was fabricated.  He took the information provided to him by both Howard and his cellmate, along

33

with other information such as the Inmate Injury Assessment and Followup forms, and wrote an incident report for a code 201 violation.  Pursuant to 28 C.F.R. § 541.10 and BOP Program Statement 5270.07, Inmate Discipline and Special Housing Unit, Bureau of Prisons' staff are obligated to issue incident reports when they are confronted with possible inmate misconduct. Howard was then provided with a DHO hearing, which complied with all of his due process rights.  At the conclusion of the hearing, the DHO found Howard had committed the violation.

Furthermore, during the Preliminary Injunction Hearing on Thursday, July 13, 2005, Howard confirmed that the contents of the incident report were true.  Specifically, Howard admitted that he was involved in a fight with his cellmate on July 24, 2003.  At this time, Howard stated, "Well, I wanted to begin at Schuykill FCI, that's where I experienced the first attack by a cell mate on July the 24[th], 2003."  See Doc. 18, Transcript of Preliminary Injunction hearing, p. 8, ¶ 15-17.  Howard's own words verify the accuracy of Defendant Reisinger's incident report.  Therefore, Howard's allegations against Defendant Reisinger are without merit.

**J.     Failure to State Constitutional Claim Regarding Falsified Incident Report**

Howard also alleges that Defendant Reisinger falsified Howard's statement in an incident Report, which violated his constitutional rights.  However, Howard's claim does not set forth a viable constitutional claim because he suffered no atypical or significant hardship as contemplated under Sandin v. Connor, 515 U.S. 472, 484 (1995).

A plaintiff, in order to state an actionable civil rights claim, must plead two essential elements: (1) that the conduct complained of was committed by a person acting under color of

34

law; and (2) that said conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  Groman v. Township of Manalapa, 47 F.3d 628, 638 (3d Cir. 1995); Strain v. Strackhouse, 920 F.2d 1135, 1141-42 (3d. Cir. 1990); Radhames v. Nash, 2005 WL 1532978 at *3 (M.D.Pa. 2005) (McClure, J.)(copy attached).

In this case, as a result of Defendant Reisinger's allegedly falsified incident report, Howard was sanctioned to: (1) 30 days in DS; (2) 180 days loss of telephone privileges; and (3) 90 days loss of commissary privileges.  As discussed *infra* none of these three sanctions deprived Howard of a constitutional right, privilege, or immunity secured by the Constitution or laws of the United States.

### 1.      Placement in Disciplinary Segregation

First, Howard has no constitutional right to placement in general population.  Under the Fourteenth Amendment, protected liberty interests may arise from the Constitution itself or may be created by state law.  Hewitt v. Helms, 459 U.S. 460, 466 (1983).   An inmate has no liberty interest under the Due Process Clause to be classified in the general population of a prison.  Sheehan v. Beyer, 51 F.3d 1170, 1175 (3d Cir. 1995).  A state-created liberty interest may exist if the correctional institution's action imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. 472, 484 (1995).

It is clear that the Howard's placement in disciplinary segregation for 30 days did not constitute an "atypical and significant hardship in relation to the ordinary incidents of prison life."  Sandin at 484.  In Sandin, the Supreme Court's decision focused on the "nature of the

35

deprivation" experienced by the prisoner.  The Court found that the conditions of confinement in <u>disciplinary</u> segregation were similar to those conditions of confinement of inmates in administrative segregation and protective custody.  In fact, the majority viewed administrative or protective custody as "not atypical" and within the "ordinary incidents of prison life."  <u>Id.</u> at 484-86.

Merely housing an inmate in the SHU, therefore, does not rise to the level of cruel and unusual punishment as it is not an "atypical or significant hardship in relation to the ordinary incidents of prison life" as contemplated in <u>Sandin</u>.  In <u>Griffin v. Vaughn</u>, 112 F.3d 703 (3d Cir. 1997), the Court found that "... determining what is 'atypical and significant' ... is ascertained by what a sentenced inmate may reasonably expect to encounter as a result of his conviction ..."  <u>Griffin</u> at 706 <u>quoting</u> <u>Sandin</u>, 515 U.S. at 486.  The <u>Griffin</u> Court continued that extended exposure to the conditions of administrative custody "falls within the expected parameters of the sentence imposed by a court of law."  <u>Griffin</u> at 708.  In this case, the length of Howard's confinement in DS was only 30 days.  It cannot be said that this length of time in DS after a DHO hearing where he received all of his due process rights amounts to an "atypical or significant hardship".

### 2.    Loss of Telephone Privileges

Howard's temporary loss of telephone privileges fails to violate a constitutional right. The BOP extends telephone privileges to inmates "as a supplemental means of maintaining community and family ties that will contribute to an inmate's personal development."  28 C.F.R. § 540.100.  Nevertheless, "[r]estrictions on inmate telephone use is subject to those

limitations which the Warden determines are necessary to ensure the security or good order, including discipline, of the institution or to protect the public." Id.  Because inmate use of telephones for social calls is wholly within the discretion of BOP officials, Howard had no liberty interest in telephone privileges. Valdez v. Rosenbaum, 302 F.3rd 1039 (9th Cir. 2002) (concerning an Alaska statute employing discretionary language).

In Lopez v. Reyes, the Fifth Circuit held that an inmate has no constitutional right to unlimited telephone use.  Lopez v. Reyes, 692 F.2d 15, 17 (5th Cir.1983).  Furthermore, the Third Circuit has stated that in order to viable claim of telephone deprivation, he must make some showing of prejudice or actual injury.  Peterkin v. Jeffes, 853 F.2d 1021, 1041 (3d Cir.1989).  The Eastern District of New York has stated that in order to show a viable claim of telephone deprivation, the inmate must show that alternative means of communication must not be sufficient.  Acosta v. McGrady, 1999 WL 158471 at *7 (E.D.Pa 1999).  In this case, Howard shows neither.  He makes no allegations that he suffered any type of injury as a result of Defendant Reisinger's allegedly false incident report or the resulting loss of his telephone privileges.  Howard also fails to claim that visitation or correspondence via the U.S. Postal Service were not available to him.  Therefore, no constitutional right is implicated.

### 3.      Loss of Commissary Privileges

Lastly, Howard's temporary loss of his commissary privileges fails to implicate a constitutional right.  Courts have held that there is no constitutional right that entitles inmates to make commissary purchases. Robinson v. Illinois State Correction Center, 890 F.Supp. 715, 718 (N.D.Ill. 1995).  In Robinson, an Illinois state inmate brought suit against prison officials

37

after he was denied the ability to purchase different items from the commissary and this denial violated his state and federal rights. <u>Id</u>., at 717. In the course of analyzing whether the plaintiff's constitutional rights were violated, the Court stated "[n]or can plaintiff reasonably contend that the Constitution embodies some right of a prisoner to purchase anything he wants from the commissary while in the custody of the state." <u>Id</u>., at 718.

Howard's conclusory allegation that Defendant Reisinger violated his constitutional rights, without supporting facts, cannot form a <u>Bivens</u> claim upon which relief may be granted. Accordingly, Defendant Reisinger is entitled to summary judgment in his favor.

## V.   CONCLUSION

Wherefore, in light of the foregoing, Defendants are entitled to judgment as a matter of law on all claims in the Amended Complaint, together with the award of the costs of this litigation and any other relief the Court deems proper and just.

<div style="margin-left:40%;">

Respectfully submitted,

THOMAS A. MARINO
United States Attorney


s/ Jennifer J. Clark
JENNIFER J. CLARK
Assistant U.S. Attorney
PA 82294
MICHELE E. LINCALIS
Paralegal Specialist
316 Federal Building
240 West Third Street
Williamsport, PA 17701
Phone:  (570)348-2800

</div>

Date: June 5, 2007                    Facsimile: (570)348-2816

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES V. HOWARD,** | : | **NO. 3:CV-05-1372** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Caputo, J.)** |
| | : | |
| **BUREAU OF PRISONS, et al.,** | : | |
| **Defendants** | : | **Filed Electronically** |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on June 5, 2007, she served a copy of the attached

## BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS
## AND FOR SUMMARY JUDGMENT

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States Mail at Williamsport, Pennsylvania.

Addressee:

James V. Howard
Reg. No. 13500-116
USP Lewisburg
P.O. Box 1000
Lewisburg, PA 17837

s/ Michele E. Lincalis
Michele E. Lincalis
Paralegal Specialist